UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

MELISSA K. CASTEEL                                                    PLAINTIFF

v.                                               CIVIL ACTION NO. 3:12-CV-136-S

MICHAEL J. ASTRUE, Commissioner,
Social Security Administration                                      DEFENDANT

**FINDINGS OF FACT
CONCLUSIONS OF LAW
AND RECOMMENDATION**

**INTRODUCTION**

Melissa K. Casteel ("Plaintiff") has filed a complaint (DN 1) pursuant to 42

U.S.C. §405(g) and §1385(c)(3) to obtain judicial review of a final decision of the Commissioner

of Social Security that denied her applications for disability insurance benefits (DIB) and

supplemental security income (SSI).  Casteel applied for DIB and SSI on May 15, 2008 (Tr. 160-

68), alleging that she became disabled on March 10, 2006 (Tr. 167), due to degenerative disk

disease of the spine, occipital neuralgia, a brain tumor, a ventral hernia, depression and anxiety

(Tr. 26).

The Commissioner denied her application on initial review (Tr. 136, 143-46, 464-

85) and on reconsideration (Tr. 137, 149-51, 639-60).  Casteel requested a hearing before an

Administrative Law Judge (ALJ).  ALJ George Jacobs conducted a hearing in Louisville,

Kentucky, on April 23, 2010 (Tr. 41-74).  Casteel attended with her attorney, Greg Marks (Tr.

41).  She and vocational expert (VE) William Harpool testified at the hearing (Tr. 48-70, 70-72).

On July 23, 2010, ALJ Jacobs entered a hearing decision (Tr. 24-35) that denied

Casteel's applications.  In his decision, ALJ Jacobs made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act

through March 31, 2008.

2.      The claimant has not engaged in substantial gainful activity since March 10, 2006, the alleged onset date (20 C.F.R. 404.1571, *et seq.* and 416.971, *et seq*.).

3.      The claimant has the following severe impairments: degenerative disk disease of the thoracic lumbar and cervical spine, occipital neuralgia/headaches, glioma/brain tumor, ventral hernia, depression and anxiety (20 C.F.R. 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), except no pushing or pulling with the lower extremities, no overhead reaching, occasional balancing, stooping, kneeling, crouching, crawling, climbing ramps and stairs, and never climbing ladders, ropes or scaffolds, and the claimant needs a sit/stand option with at least 30 minutes in a position.  The claimant should avoid workplace hazards including working around unprotected heights and dangerous moving machinery and the claimant should avoid work around fumes, odors, dust, gases, and poor ventilation.  The claimant can perform simple repetitive tasks with no production rate pace work but rather goal directed work with no more than occasional contact with co-workers and supervisors and no contact with the public.

6.      The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.      The claimant was born on April 14, 1971, and was 34-years-old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.      The claimant has at least a high-school education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P. Appx. 2).

10.     Considering the claimant's age, education, work experience, and residual

2

functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from March 10, 2006, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. 24-35).[1]

Casteel requested review of the ALJ's decision by the Appeals Council (Tr. 18-20), arguing that: (1) the severity of her impairments satisfies the criteria of listing 12.04 of the listing of impairments found in 20 C.F.R. Part 404, Subpart P, Appx. 1; and that her treating physician, Dr. Vitaz, concluded that her debilitating daily headaches preclude substantial gainful activity (Tr. 8-15). The Appeals Council determined that no reason exists under the regulations to grant her request (Tr. 1-6).

Casteel then filed her present complaint (DN 1). The Commissioner has filed an answer (DN 9). Both parties have filed a fact and law summary (DN 12, 15). The administrative record also has been filed (DN 10). Accordingly, the matter is ripe for consideration by the Magistrate Judge.

---

[1] On March 9, 2006, in a prior adverse hearing decision rendered by ALJ  D. Lyndell Pickett, the Commissioner determined that Casteel's severe impairments of degenerative disk disease, headaches and bipolar disorder did not preclude her from performing a restricted range of alternative light work that included such jobs as house cleaner, night watch guard and inspector (Tr. 133). The Commissioner accordingly determined that Casteel was not disabled at step 5 of the sequential evaluation process.  20 C.F.R. 404.1520(g), 416.920(g).  Because ALJ Jacobs considered Casteel's subsequent disability claim on an unadjudicated period involving the same titles of the Social Security Act as Casteel's prior claim, he was bound by *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) and *Acquiescence Ruling*, 98-4(6) to adopt the findings of the prior final decision by ALJ Pickett absent new and material evidence related to the prior findings.  *Id*.  Neither party disputes the application of AR 98-4(6) and *Drummond* to the present case.

**Arguments.**

Casteel in her fact and law summary takes issue with findings 4, 5, 9, 10 and 11 of ALJ Jacobs' hearing decision (Tr. 24-35).  She argues with regard to finding no. 4 that the severity of her non-exertional impairments, depression and anxiety, satisfies the listing criteria for listing 12.04, affective disorders (DN 12, pp. 4-8).  In particular, Casteel maintains that she meets the paragraph "B" criteria of listing 12.04 due to her marked restrictions in activities of daily living, social functioning, and concentration, along with her repeated episodes of decompensation.

Casteel also challenges the residual functional capacity (RFC) determination of finding no. 5 that she remains able to perform a limited range of sedentary work.  Her challenge in this respect is based on MRI imaging of her brain taken in June of 2009.  According to Casteel,  the imaging objectively confirms a slow, progressive increase in the size of her benign brain tumor.  This increase allegedly has resulted in Casteel suffering persistent daily headaches of sufficient intensity to cause her treating doctor, Todd Vitaz, M.D., to conclude that she is not able to work (DN 12, pp. 9-12).

These debilitating headaches, and the degenerative disk disease in her spine, cause Casteel to suffer from continuing back pain.  Her pain imposes significant limitations on her ability to sit, stand or walk.  It precludes the performance of even a limited range of sedentary work in her view.  *Id*.  Casteel also argues that the Commissioner has failed to demonstrate that she has transferrable job skills so that finding no. 9 is not supported by substantial evidence (DN 12, p. 12).  For all of these reasons, she concludes that findings no. 10 and 11 likewise are unsupported (*Id*. at 13).

4

To address the arguments raised by Casteel, we first must set forth the sequential evaluation process employed by the Commissioner and the standard of review applied to his findings by this Court.

**The Five-Step Sequential Evaluation Process.**

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. See, 20 CFR §§ 404.1505, 416.905(a). To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed. 20 CFR §§ 404.1520, 916.920(a). At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled. See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971. *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities. See 20 CFR §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2. *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

5

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations.  20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix.  *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989).  A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3)  The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who can not return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience.  See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999).  Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Disability Review Process**.

Disability is defined by law as being the inability to do substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See, 20 CFR §§ 404.1505, 416.905(a).  To determine whether a claimant for DIB or SSI benefits satisfies such definition, a 5-step evaluation process has been developed. 20 CFR §§ 404.1520, 916.920(a).  At step 1, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the Commissioner will find the claimant to be not disabled.  See, 20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(ii), 416.971.  *See, Dinkel v. Secretary*, 910 F2d, 315, 318 (6th Cir. 1990).

If the claimant is not working, then the Commissioner next must determine at step 2 of the evaluation process whether the claimant has a severe impairment or combination of severe impairments that significantly limit his or her ability to perform basic work activities.  See 20 CFR §§ 404.1520(a)(4)(ii),  416.920(a)(4)(ii).  If the impairments of the claimant are determined by the Commissioner to be non-severe, in other words, so slight that they could not result in a finding of disability irrespective of a claimant's vocational factors, then the claimant will be determined to be not disabled at step 2.  *See, Higgs v. Bowen*, 880 F.2d 960, 962 (6th Cir. 1988); *Mowery v. Heckler*, 771 F.2d 966, 971-72 (6th Cir. 1985).

If the claimant has a severe impairment or impairments, then the Commissioner at step 3 of the process will determine whether such impairments are sufficiently serious to satisfy the listing of impairments found in Appendix 1 of Subpart B of Part 404 of the federal regulations.  20 CFR §§ 404.1520(A)(4)(iii), 416.920(a)(4)(iii) The claimant will be determined

to be automatically disabled without consideration of his or her age, education or work experience if the claimant's impairments are sufficiently severe to meet or equal the criteria of any impairment listed in the Appendix. *See*, *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

When the severity of the claimant's impairments does not meet or equal the listings, then the Commissioner must determine at step 4 whether the claimant retains the residual functional capacity (RFC) given his or her impairments to permit a return to any of his or her past relevant work.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  *See, Smith v. Secretary*, 893 F.2d 106, 109-110 (6th Cir. 1989).  A claimant who retains the residual functional capacity, despite his or her severe impairments, to perform past relevant work is not disabled. 20 CFR §§ 404.1560(b)(3), 416.960(b)(3)

The burden switches to the Commissioner at step 5 of the sequential evaluation process to establish that the claimant, who can not return to his or her past relevant work, remains capable of performing alternative work in the national economy given his or her residual functional capacity, age, education and past relevant work experience.  See, 20 CFR §§ 404.1520(a)(4)(v), 404.1560( c ), 416.920(a)(4)(v), 416.960( c ); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994); *Herr v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999). Collectively, the above disability evaluation analysis is commonly referred to as the "5-step sequential evaluation process."

**Listing 12.04 of the Listing of Impairments.**

Casteel's first claim is that she met her burden to establish disability at step 3 of

the sequential evaluation process.  According to Casteel, her depression and anxiety meet or equal the criteria of the listing for affective disorders at listing 12.04 in Appendix 1.  See 20 CFR §404.1520(d) (2012).  When the evidence of record establishes that a claimant like Casteel has an impairment that meets all of the requirements for a particular listed impairment, and satisfies the 12-month duration requirement, a favorable finding of disability will be made at step 3 without regard to the claimant's age, education or work history.  *Lankford v. Sullivan*, 942 F.2d 301, 306 (6th Cir. 1991); *Gambill v. Bowen*, 823 F.2d 1009, 1011 (6th Cir. 1987).  In other words, if the symptoms, signs and laboratory findings in the medical evidence are at least equal in their severity and duration to those of a listed impairment, then the claimant's impairments will be deemed medically equivalent to the listed impairment, and the claimant will be found to be disabled at step 3.  *Dorton v. Heckler*, 789 F.2d 363, 366 (6th Cir. 1986) (*per curiam*); *Land v. Sec'y of HHS*, 418 F.2d 241, 245 (6th Cir. 1985).

It is not sufficient that the claimant suffers from an impairment or impairments which merely come close to meeting the criteria of the listing.  *Dorton*, 789 F.2d at 366; *Price v. Heckler*, 767 F.2d 281, 284 (6th Cir. 1985) (*per curiam*).  All of the criteria of the listed impairment at issue must be satisfied.  *Hale v. Sec'y of HHS*, 816 F.2d 1078, 1083 (6th Cir. 1987) (*per curiam*).  While the testimony of a medical expert that a claimant's impairments meet or equal the listing can be substantial evidence to support the determination of the Commissioner, such testimony must be supported by adequate medical findings; a physician's mere conclusory statement will not be sufficient.  *Atterberry v. Sec'y of HHS*, 781 F.2d 567, 570 (6th Cir. 1989); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Casteel argues that the evidence related to her (1) ongoing treatment for

9

depression and anxiety, along with her (2) psychiatric consultative examination results obtained by Christopher Catt, Psy.D. and Kathleen Powers, M.A., establish her disability under listing 12.04.  Affective disorders under listing 12.04 are characterized by a disturbance of mood that is accompanied by a full or partial manic or depressive syndrome.  20 CFR, Part 404, Subpart P, Appendix 1, §12.04 (2012).  The listing provides that the required level of severity for affective disorders is met when the requirements in both paragraphs A and B of the listing are satisfied, or when the requirements of paragraph C are satisfied.

ALJ Jacobs in his hearing decision makes no mention of the requirements for paragraph A of listing 12.04.  Rather, he concludes that Casteel's "mental impairments, considered singularly and in combination, do not meet or medically equal the criteria of listing 12.04 and 12.06."  (TR 30).  He immediately adds that "in making this finding, the undersigned has considered whether the 'paragraph B' criteria are satisfied." (*Id*.).[2]  ALJ Jacobs then concludes that Casteel has only mild restrictions in her activities of daily living, and moderate difficulties in her social functioning and her concentration, persistence or pace.  (Tr. 30).  He finds that Casteel has experienced no episodes of decompensation of an extended duration (*Id*.).

Casteel takes direct issue with all of these findings.  She argues that her testimony and the consultative psychiatric examination results reveal marked[3] restrictions in all of the

---

[2]  The paragraph B criteria of listing 12.04 require at least two of the following: 1) marked restriction in activities of daily living; or 2) marked difficulties in maintaining social functioning; or 3) marked difficulties in maintaining concentration, persistent or pace; or 4) repeated episodes of decompensation, each of extended duration.  20 CFR Part 404, Subpart P, Appendix 1,  §12.04D.

[3]  The term "marked" is defined by listing 12.00C to mean "more than moderate but less than extreme."  20 CFR Part 404, Subpart P, Appendix 1, § 12.00(c).  The regulation explains that "a marked limitation may arise when several activities or functions are impaired, or even

10

applicable paragraph B criteria of listing 12.04, along with repeated episodes of decompensation (DN 12, p. 6-8). Casteel claims marked restrictions in her activities of daily living, social functioning and concentration due to her recurring migraine headaches and back pain related to her occipital neuralagia,[4] glioma[5] (brain tumor) and degenerative disk disease.

       Casteel quotes from various portions of her disability report form, SSA 3368, as proof of her marked limitations (Tr. 174-183). Specifically, she refers to her difficulty with performing housework due to her pain (TR 175), which she alleges is confirmed by her mother's statements in the adult function report - third party, form SSA-3380 (TR 189). Casteel explains that due to her pain she must take frequent breaks so that trying to do housework takes all day and requires help (*Id.*). Her mother, Elizabeth Gibbons, reports that her daughter is "barely able"

---

when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." *Id*.

  [4] Occipital neuralgia is a distinctive type of headache characterized by a piercing or throbbing chronic pain in the upper neck, back of the head and behind the ears. The location of the pain relates to those areas that are supplied by the greater and lesser occipital nerves, which run from the area where the spinal column meets the neck, upward toward the scalp at the back of the head. Irritation or injury to the occipital nerves, trauma to the back of the head, or pinched nerves due to overly tight muscles, osteoarthritis or tumors or lesions in the neck cause the resulting pain. See National Institute of Neurological Disorders and Stroke, Occipital Neuralgia Information Page at
http://www.ninds.nih.gov/disorders/occipitalneuralgia/occipitalneuralgia.htm (last visited Sept. 12, 2012).

  [5] The term "glioma" includes a broad range of brain and spinal cord tumors that originate in the glial cells of the brain. Approximately 42% of all brain tumors are gliomas. The symptoms of a glioma depend on the area of the brain affected, with the most common symptom being a headache. Approximately half of all individuals diagnosed with a brain tumor will exhibit headaches with other possible symptoms to include seizure, memory loss, physical weakness, loss of muscle control, visual or language symptoms, cognitive decline and personality changes. See http://www.webmed.com/cancer/brain-cancer/malignant-gliomas (last visited Sept. 12, 2012).

to prepare meals or to clean her home due to her constant severe pain, which makes it difficult for her to do such simple things as to bathe, shave and fix her hair (TR 61-62, 190).

Casteel testified during the hearing before ALJ Jacobs that she has emotional problems with depression that make it difficult for her to deal with stress or to be around people (TR 57-58). Casteel advised the ALJ that she has very few friends and only once or twice a month does she visit with them (TR 64-65). She belongs to no social organizations, clubs or church (TR 65). Casteel and her mother, in their respective reports, (TR 174-183, 188-196) explain that Casteel is preoccupied with her constant head and neck pain. When her pain is aggravated by chemicals, smells, perfumes or lights, it will become a migraine headache accompanied by nausea and vomiting (TR 175, 189).

As for her concentration, Casteel again cites statements contained in the adult disability report she prepared (TR 174-83). In her report, Casteel claims that she has memory problems due to her brain tumor, that she will frequently misplace items and often must be reminded to take her medications due to her weak memory (TR 175, 191-92). She points to her hearing testimony that she is not always able to follow the plot of movies that her daughter watches on the Disney channel (TR 61) as further indication of her marked limitation in concentration. Finally, Casteel asserts without elaboration that the administrative record is "replete" with examples of her repeated episodes of decompensation of an extended duration.[6]

_____

[6] Such episodes of decompensation according to listing 12.00C(4) are demonstrated by exacerbation in symptoms or signs that ordinarily require increased treatment or a less stressful situation. These episodes of decompensation may be inferred from medical records that reveal a significant increase in medication or documents which show the need for a structured psychological support system such as hospitalization or placement in a halfway house. See 20 CFR Part 404, Subpart P, Appendix 1, listing 12.00C(4).

Plaintiff's testimony, and that of her mother, taken in isolation might arguably support more severe limitations of the paragraph B criteria than those determined by ALJ Jacobs (TR 30). As noted, ALJ Jacobs found that Casteel has only a mild restriction in her ability to perform activities of daily living and only moderate restrictions in her ability to function socially and her ability to maintain concentration, persistence and pace. Examination of the entire administrative record persuades the Magistrate Judge that substantial evidence does support these less severe "B" criteria limitations contained in finding of fact no. 4 when all the facts are considered.

These findings by ALJ Jacob are supported not only by portions of Casteel's hearing testimony, but by the results of the consultative psychological examination report produced by Christopher Catt, Psy. D., as well (TR 379-83). The consultative report notes in the section on adaptive behavior that Casteel is able to maintain a residence with her children, do basic household tasks, prepare simple foods, use a microwave and stove, and perform her all personal grooming and hygiene unassisted (TR 382). Casteel reported to Dr. Catt that she independently manages a checking account, pays her own bills, can shop independently, and watches TV. Casteel also reported to Catt that she occasionally visits with her family and friends (TR 382). The report notes that Casteel exhibited adequate attention and concentration to the completion of tasks during the consultative examination testing (TR 381-82).

Dr. Catt in the summary section of the report concludes, based on the administered psychological tests and on observation, that Casteel has only slight limitations in her ability to: (1) understand, remember and carry out instructions for the performance of simple repetitive tasks; (2) tolerate stress and pressure of day-to-day employment; (3) sustain attention

13

and concentration toward the performance of simple repetitive tasks; and (4) respond appropriately to supervision, co-workers and work pressures in a work setting. (TR 382-83). He states that Casteel's prognosis for improvement is fair-to-good with appropriate mental health intervention and that she had no substantive cognitive limitations evident at the time of the examination (TR 383).

These findings of Dr. Catt are reflected in the psychiatric review technique results obtained by two non-examining state agency consultants, Edward Stodola, Ph.D., and Jan Jacobson, Ph.D. (TR 464-77, 639-52). Dr. Stodola found a medically determinable impairment of major depression, which he determined to be non-severe (TR 464, 467). Dr. Stodola then rated the paragraph B criteria of listing 12.04 to include only mild limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace (TR 474). He found no episodes of decompensation for an extended duration (*Id*.). Dr. Jacobson likewise found a major depressive disorder under listing 12.04 for affective disorders (TR 642) that did not result in a severe impairment (TR 639). He also found only mild limitation in the paragraph B criteria of listing 12.04 with no extended episodes of decompensation (TR 649).[7]

Various portions of Casteel's own testimony further support the finding of ALJ Jacobs on the paragraph B criteria of the listing. Casteel testified at the hearing that she has a driver's license and that she drove approximately an hour and a half to the hearing (TR 47-48).

---

[7] ALJ Jacobs at p. 3 in his hearing decision did find the Casteel suffers from a severe impairment of depression (TR 26). Accordingly, to this extent, ALJ Jacobs found in Casteel's favor as to the severe nature of her depression, but otherwise concluded that it did not result in marked limitations in any two of the paragraph B criteria of the affective disorder listing 12.04.

She ordinarily arises each morning between 6 and 7 a.m. to get her 9-year-old daughter off to school (TR 59).  She occasionally will make breakfast for her daughter (*Id*.).  She also is able to prepare dinner in the evenings, which ordinarily consists of microwaveable food (TR 60).  During the day, Casteel, watches television or sometimes goes to the store with her sister (*Id*.).  In the evenings, she will watch tv with her daughter (TR 61).  Casteel is able to dress and bathe herself, wash her hair, occasionally do laundry and the dishes and can manage her money, which consists primarily of her monthly child support payments (TR 62-63).  She does visit with her friends several times a month (TR 64-65).  Accordingly, her own testimony is partially supportive of the findings of the ALJ at finding of fact no. 4 (TR 30).

Casteel points to the global assessment of functioning (GAF) score assessed by Dr. Catt as proof of her marked limitations in the B criteria of the listing (TR 382).  Dr. Catt at page 4 of his consultative psychological examination report assesses Casteel with a GAF of 48.  She correctly points out that a GAF score of 48 is considered to be indicative of serious symptoms or a serious impairment in social, occupational or school functioning based on the American Psychiatric Association*, Diagnostic and Statistical Manual of Mental Disorders*, p. 34 (Fourth Edition 2000) (DSM-IV-TR).

The Commissioner does not dispute the existence of this GAF score or its implications according to the DSM-IV-TR (DN 15, p. 8).  Rather, he argues that the GAF by federal regulation is not included as part of the listing requirements and, according to the Social Security Administration, "does not have a direct correlation to the severity requirements in our mental disorder listings."  (*Id*.) (citing 65 Fed. Reg. 50746, 50764-65 (2000)).  According to the Commissioner, such GAF numbers are not the product of standardized tests, but rather are

subjectively assessed by each clinician.  Therefore, GAF scores cannot be taken in isolation to

support or oppose a particular finding in the view of the Commissioner.

       This view is shared by the Sixth Circuit.  In *Kennedy v. Astrue*, 247 Fed. Appx.

761, 766 (6th Cir. 2007), the court explained:

> [T]he Commissioner "has declined to endorse the [GAF] score for
> use in the Social Security and SSI Disability programs, and has
> indicated that [GAF] scores have no direct correlation to the
> severity requirements of the mental disorder listings."  *Id*. (citing
> *Devoard v. Comm'r*, 211 Fed. Appx. 411 (6th Cir. 2006) (quoting
> *Wind v. Barnett*, 133 Fed. Appx. 684, 691-92 n. 5 (11th Cir. 2005)).
> The GAF scores, therefore, are not raw medical data and do not
> necessarily indicate improved symptoms or mental functioning.

*Kennedy*, 247 Fed. Appx. at 766.  *See also, Bratton v. Astrue*, 2010 WL 2901856 at *8 (M.D.

Tenn. July 19, 2010) ("[T]he Sixth Circuit recognizes that a GAF score is a physician's

subjective evaluation and not raw medical data.").  *See also, Oliver v. Comm'r*, 415 Fed. Appx.

681, 684 (6th Cir. Mar. 17, 2011) ("A GAF score is thus not dispositive of anything in and of

itself, but rather only significant to the extent that it elucidates an individual's underlying mental

issues.").

       Here, the 48 GAF score assessed by Dr. Catt likewise cannot be viewed in

isolation.  The score is directly contradicted by Dr. Catt's own conclusions in his report.  Dr.

Catt assesses only slight limitations on Casteel's ability to perform simple repetitive tasks,

tolerate work-related stress, sustain concentration towards the performance of simple repetitive

tasks, and respond appropriately to supervision, co-workers and work pressures in a work

setting.  (*Id.*).  These findings contradict any serious symptoms or serious impairment in social,

occupation or school functioning.  Consequently, Casteel's GAF score of 48 is not determinative

of the issue.

16

It does not negate the remaining evidence in support of ALJ Jacobs' finding that she does not satisfy the paragraph B criteria of listing 12.04 for affective disorders.  *See Lawson v. Comm'r*, 192 Fed. Appx. 521, 530-31 (6th Cir. 2006) (claimant who was determined by consultative examiner not to have any "marked" restrictions under part B of listing 12.04 failed to satisfy the criteria for an affective disorder impairment under the listings).  *Stewart v. Astrue*, 2012 WL 3188773 at *7-8 (S.D. Ohio Aug. 3, 2012) (same); *Clark v. Astrue*, 2012 WL 3597202 at *10-11 (M.D. Tenn. Aug. 2, 2012) (same).

**Residual Functional Capacity.**

Casteel next argues in her fact and law summary that ALJ Jacobs' finding of fact no. 5 is not supported by substantial evidence (DN 12, pp. 9-12).  In finding no. 5, ALJ Jacobs concludes that Casteel remains able to perform a limited range of sedentary work as defined by 20 C.F.R. 404.1567(a) and 419.967(a) with the various exertional and nonexertional limitations described above at page 2 of this recommendation.[8] (TR 31).  ALJ Jacobs concludes that Casteel does exhibit underlying medically determinable physical and mental impairments that could reasonably be expected to produce her complaints of pain, but he finds that the evidence of record does not support the intensity, persistence or functionally limiting effects of her pain or other symptoms.  In this respect, ALJ Jacobs determined that Casteel's testimony concerning her

_____

[8] ALJ Jacobs correctly notes in his hearing decision that in making his RFC finding he was bound by the provisions of AR 98-4(6) and *Drummond, supra.*, based on the prior ALJ decision of March 9, 2006, which determined that Casteel retains the RFC to perform light work with occasional reaching overhead, occasional kneeling or stooping and no crawling or climbing ladders, ropes or scaffolds.  Due to ALJ Jacobs' determination that Casteel's musculoskeletal pain and headaches had increased, however, he reduced the exertional level from light to sedentary and increased the work restrictions to preclude overhead reaching (TR 31).

17

subjective complaints is not entirely credible when viewed in the entirety of the evidence (TR 31-33).

Casteel challenges these findings.  She points out that since her diagnosis with a low grade glioma in 2006, repeated MRI scans of her brain have revealed an increase in the size of the benign tumor (TR 674-75, 661-68).  This increase, she points out, is noted by Dr. Timothy Burger in his MRI brain imaging report of June 25, 2009 (TR 687).  Dr. Burger in his report states that "there is a slow progressive increase in the size of the focus of abnormal signal intensity which appears to be involving the subcortical U-fibers of the anterior subinsular cortex and the left frontal lobe and left temporal lobe."  (*Id*)  Likewise, a subsequent brain MRI in August of 2009, reveals images of "abnormal increase signal within the inferior right frontal lobe subcortical white matter."  (TR 703).

Casteel observes that her treating neurosurgeon, Todd Vitaz, M.D., believes that her persistent headaches are consistent with the existence of a glioma (TR 674-75), but the risks of surgery (open resection) to remove it are too high given the small size of the lesion and its location close to Broca's area[9].  (*Id*.)  Beyond the objectively established existence of her glioma, Casteel notes that her neurosurgeon, Dr. Joseph Finizio, concludes that her occipital neuralgia also may be contributing to her debilitating daily headaches (TR 384).  These headaches, according to Casteel's testimony, consistently rank 6 out of 10 on a 10-point pain scale with her migraine headaches being rated by her as a 10+ on the same scale (TR 52).

---

[9] The "Broca area" is the region of the brain that contains motor neurons involved in the control of speech.  The area is located in the frontal part of the left hemisphere of the brain and was discovered in 1861 by French surgeon, Paul Broca."
http://www.britannica.com/EBchecked/topin/135877/Broca-area   (Last visited Sept 12, 2012).

Indeed, her headaches are so severe and persistent that Dr. Vitaz has offered his professional opinion that Casteel "is probably going to be unable to work because of her chronic headaches, which she has had for several years and appear to be debilitating her."  (TR 666). Although Casteel acknowledges that ALJ Jacobs was not bound by this opinion, she maintains that the doctor's opinion was still entitled to great deference, given that it was his professional, commonsense assessment of the objective medical evidence of record.   ALJ Jacobs, however, failed to accord Dr. Vitaz's opinion proper weight according to Casteel.

In addition to the limitations imposed by her brain glioma, Casteel argues that she is further restricted in her functional capacity by her degenerative disk disease and spinal stenosis, which cause her significant, ongoing pain.  Casteel notes that an MRI obtained in March of 2009, confirmed the existence of diffuse posterior annular bulging at the L4-5 level of her spine, which has resulted in some mild bilateral inferior foraminal narrowing (TR 788). Further, Dr. Gary Vitale noted in May of 2009, that her spinal MRI indicated "some dehydration of several of the disks and bulging of the disk at th L4-5 level."  (TR 613-14).  She additionally was noted to have foraminal stenosis at the C3-4.

Casteel complains that she experiences back pain "all the time" (TR 52) and in March of 2009, underwent a thoracic facet injection in an effort to alleviate her pain (TR 734-35).  She describes her back pain level as being 7 on a 10-point scale, with her pain being aggravated by sitting, standing and lying down (TR 52-53).  Likewise, Casteel cites her testimony that her neck pain also is constant and is readily exacerbated by any number of common activities.  (*Id*.).  Casteel testified that no treatments or other modalities have provided her with significant relief for her neck and back pain.  At most, she receives treatment with

19

Methadone and Percocet for her headaches, which have significant side effects that further

reduce her functional capacity to perform work.  For these reasons, Casteel maintains that she

should have been found by ALJ Jacobs to be disabled as the administrative record reveals that

she is incapable of performing even a limited range of sedentary work contrary to the ALJ's

finding of fact no. 5 (TR 31-33).

       An administrative law judge properly may consider the credibility of a claimant

when evaluating the claimant's subjective complaints, and the federal courts will accord "great

deference to that credibility determination."  *Warner v. Comm'r*, 375 F.3d 387, 392 (6th Cir.

2004).  The standard in the Sixth Circuit for evaluating subjective complaints, such as

complaints of pain for example, was established in *Duncan v. Sec'y of H&HS*, 801 F.2d 847, 853

(6th Cir. 1986).  *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (setting forth the *Duncan*

standard).

       Under *Duncan*, the Court first determines whether objective medical evidence of

an underlying medical condition is present in the record.  *Id*.  If so, then the Court will examine

whether such evidence confirms the severity of the claimant's subjective symptoms related to the

condition, or whether the objectively established medical condition itself is of sufficient severity

that it can be reasonably expected to produce the alleged subjective symptoms, such as disabling

pain.  *Id*.  The findings of the ALJ in this regard are repeatedly held in the Sixth Circuit to be

accorded great weight and deference given the ability of the ALJ to observe the demeanor and

credibility of the witnesses.  *Walters v. Comm'r*, 127 F.2d 525, 531 (6th Cir. 1997) (citing

*Villarreal v. Sec'y*, 818 F.2d 461, 463 (6th Cir. 1987)).  Yet, the ALJ is not accorded absolute

deference and his or her assessment of a claimant's credibility must be supported by substantial

20

evidence.  *Beavers v. Sec'y*, 577 F.2d 383, 386-87 (6th Cir. 1978).

When the ALJ "finds contradictions among the medical reports, claimant's testimony and other evidence," the ALJ may properly discount the credibility of the claimant. *Winning v. Comm'r*, 661 F. Supp.2d 807, 822 (N.D. Ohio 2009) (citing *Walters*, 127 F.3d 525, 531 (6th Cir. 1997)).  The ALJ, however, is not permitted to render a credibility determination based solely upon a hunch, or "intangible or intuitive notion about an individual's credibility." *Id*. (citing *Rogers*, 486 F.3d at 247) (citing SSR 96-7p)).  Under SSR 96-7p, the ALJ must in the hearing decision set forth specific reasons for the credibility determination sufficient to make clear to the claimant and subsequent reviewers the weight that the ALJ gave to the claimant's statements and the reasons for such weight.  *Winning*, 661 F. Supp.2d at 823.  A mere blanket assertion that a claimant is not believable will not be sufficient under SSR 96-7p.  *Id*. (citing *Rogers*, 486 F.3d at 248).

An assessment of the claimant's credibility must be based on a consideration of all the evidence of record.  It should include consideration of not only the objective medical evidence but the following factors as well: (1) the daily activities of the claimant; (2) the location, duration, frequency, and intensity of the claimant's symptoms including pain; (3) any factors that precipitate or aggravate the symptoms; (4) the dosage, type, effectiveness and side effects of any medication taken to alleviate such symptoms or pain; (5) treatment that the claimant has received for relief of his or her symptoms; (6) any measures other than treatment that the claimant uses to relieve his or her symptoms; and (7) any other factors relating to the functional limitations and restrictions of the claimant due to such symptoms or pain.  *Id*. at 823 n. 14 (citing SSR 96-7p).  Also included among the evidence that the ALJ must consider are the

medical signs and laboratory findings of record, the diagnosis, prognosis and medical opinions

provided by any treating physicians or other medical sources, and any statements or reports from

the claimant, physicians or other persons about the claimant's medical history, treatment,

response to treatment, prior work record, daily activities and other information related to the

symptoms of the claimant and how such symptoms affect his or her ability to work.  *Id.*

When the record establishes consistency between the subjective complaints of the

claimant and the other evidence of record, such consistency will tend to support the credibility of

claimant, while in contrast, any inconsistency will tend to have the opposite effect.  *Winning*,

661 F. Supp.2d at 823.  The reviewing court does not make its own credibility determinations.

*Franson v. Comm'r*, 556 F. Supp.2d 716, 726-27 (W.D. Mich. 2008) (citing *Walters*, 127 F.3d at

528)).  The federal courts will not substitute their own credibility determination for that of the

ALJ as the fundamental task of the Commissioner is to "resolve conflicts in the evidence and to

decide questions of credibility."  *Rineholt v. Astrue*, 617 F. Supp.2d 733, 742 (E.D. Tenn. 2009)

(citing *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).  Given the substantial deference

accorded the credibility determination of the Commissioner, "'claimants challenging the ALJ's

credibility determination face an uphill battle.'"  *Franson*, 556 F. Supp.2d at 726-27 (citing

*Daniels v. Comm'r*, 152 Fed. Appx. 485, 488 (6th Cir. 2005)).

Here, ALJ Jacobs made a careful assessment of the medical evidence of record,

along with Casteel's symptoms, daily activities, medication, and treatment history in determining

her residual functional capacity.  In his detailed discussion of that medical history, ALJ Jacobs

correctly notes that Dr. Finizio, Casteel's neurosurgeon, advised her in May of 2007, that he did

not believe she needed any further treatment with respect to the mass in her left frontal lobe (TR

404).  At most, Dr. Finizio indicated at that time that watchful waiting would be sufficient, and

Casteel then declined to have a biopsy performed (TR 404-05).  In the same treatment notes, the

doctor indicated that he had treated Casteel's headaches with  a muscle relaxer and that "it does

help with the headaches, but does not get rid of them completely."  (TR 404).

   Subsequently, in July of 2008, Dr. Finizio's treatment notes  indicate that Casteel

had "no worsening of her headaches" and her physical examination was otherwise unremarkable

with normal strength and sensation throughout and her memory, attention span and concentration

all intact.  (TR 384).  An MRI of Casteel's brain showed "no change in the left frontal lobe

region as compared to previous MRIs."  (*Id.*).  Dr. Finizio advised Casteel that he did not believe

her headaches are coming from her brain lesion, but rather were more consistent with occipital

neuralgia.  (*Id.*).  He recommended she continue with her previously prescribed exercises "that

have helped her with some of her headache pain...."  (*Id.*).  Dr. Finizio concluded that Casteel did

not need any surgical intervention and, at most, recommended another MRI be performed in six

months.  His treatment notes reiterate that he does not feel her headaches are coming from the

left frontal lesion.  (*Id.*).

   No further growth of Casteel's glioma is noted in the medical records until the

July 29, 2009 treatment notes of Dr. Vitaz, who indicates that there appears to be only a slight

progression of the lesion revealed when he compared the 2007 brain MRI films to the most

recent films in 2009, with "no significant obvious changes."  (TR 674).  Dr. Vitaz adds that

while there may be "some very subtle changes, ... the size and configuration for the most part

looks about the same."  (*Id.*).  Dr. Finizio indicates in his treatment notes of July 20, 2009 only

that he believes the low grade glioma "has gotten slightly larger."  (TR 681).

23

At most, the diagnostic imaging report of Dr. Burger dated June 25, 2009, indicates "a slow but progressive increased size of the curvilinear focus of the abnormal signal within the anterior subinsular cortex of the left frontal and temporal lobes."  (TR 687). Subsequently, when Casteel did undergo a stereotactic biopsy of the left frontal abnormality in September of 2009, Dr. Vitaz noted that "the pathology came back non-diagnostic and a neuro-glial tissue, but not suspicious for tumor, according to Dr. Parker."  (TR 666).

Although Casteel is being treated with medication of Methadone and Percocet for her headaches, pain management treatment notes of February 25, 2010, from Flaget Memorial Hospital indicate that Casteel is "doing relatively well on current medications."  (TR 716). Earlier Flaget pain management notes from November of 2009, reveal that Casteel experienced a 50% improvement in her occipital headaches from bilateral greater occipital nerve blocks (TR 729). While she continued to experience headaches due to her frontal lobe glioma, treatment records confirm that she was doing "relatively well on Methadone, 20 mg, three times a day and Percocet 10 mg, four times day for breakthrough pain." (*Id.*).  Accordingly, examination of Casteel's treatment records reflect that she tolerates her pain medication relatively well.

Finally, as ALJ Jacobs noted, Dr. Gregory Nazar, also a neurosurgeon, concluded from his examination of Sept. 10, 2009, that given the minimal degenerative changes revealed by Casteel's cervical MRI study, and her otherwise unremarkable brain MRI with the exception of the low-grade tumor, which Dr. Nazar doubted was related to her headaches, he did "not have a good explanation for her headaches ... and did not see evidence of a structural abnormality that could be associated with that."  (TR 486).  Accordingly, the above-cited portions of the medical records relied on by ALJ Jacobs are directly supportive of his residual functional capacity and

credibility determinations.

Casteel faults ALJ Jacobs for his failure to give proper deference to the opinion of Dr. Vitaz, her treating neurologist, who expressed the opinion, as noted, that Casteel "is probably going to be unable to work because of her chronic headaches, which she has had for several years and appear to be debilitating her."  (TR 666).  Casteel characterizes this opinion as being simply what is a commonsense assessment of the objective medical evidence of record.  This argument calls into question the Social Security regulations that relate to the opinions from treating sources.

Social Security regulations provide at 20 C.F.R. § 404.1527(d)(2) that the opinions of treating sources are ordinarily given substantial deference, and indeed controlling weight, if the ALJ finds that the opinion is "well supported by medically accepted clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2)(2004).  *See gen., Schaal v. Atfel*, 134 F.3d 496, 503 (2nd Cir. 1998) (generally discussing the treating source regulation).  If the ALJ declines to give the opinion of the treating source controlling weight, then the ALJ is required to determine what weight to give the opinion based upon the length of the treatment relationship, frequency of examination, nature and extent of the relationship, supportability of the opinion and consistency of the opinion with the record as a whole.  Id.

Social Security ruling 96-2p further provides that when the decision of the Commissioner denies benefits it "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewer the weight the adjudicator gave

25

the treating source's medical opinion and the reasons for that weight."  SSR 96-2p, 1996 WL

374188 at *5 1996.  As the Sixth Circuit explained in *Wilson*, this requirements exists "to let

claimants understand the disposition of their cases particularly in situations where a claimant

knows that her physician has deemed her disabled and therefore "might be especially bewildered

when told by the administrative bureaucracy that she is not, unless some reason for the agency's

decision is supplied." *Wilson,* 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2nd Cir.

1999).

        In this case, ALJ Jacobs properly rejected the opinion of Dr. Vitaz, as being not

entitled to significant weight.  (TR 32).  The ALJ correctly noted the cursory nature of the

opinion and its reliance on the subjective symptomology of the Plaintiff. (*Id.*).   ALJ Jacobs also

correctly noted that diagnostic imaging of Casteel's glioma caused Drs. Finizio and Nasar to

conclude that the glioma was unlikely to be the source of Casteel's headaches; nor did the

minimal degenerative changes revealed by the diagnostic imaging of her spine account for her

complaints of headache pain (*Id.*).  As noted,  pain management records repeatedly reveal that

Casteel tolerated her pain medications and was reported on multiple occasions to be doing

"relatively well" with them.  Consequently, ALJ Jacobs correctly determined that the opinion of

treating physician Dr. Vitez was not entitled to substantial weight.  To the extent that Dr. Vitez

expressed his personal view that Casteel is "unable to work," his opinion on the ultimate issue of

her disability involved an opinion on an issue expressly reserved to the Commissioner.  20

C.F.R. §§404.1527(e), 416.927(e); *Warner v. Comm'r*, 375 F.3d 387, 391 (6th Cir. 2004).

        As for Casteel's claims of debilitating back pain related to her degenerative disk

disease, the record substantially supports the finding of ALJ Jacobs that diagnostic imaging of

the spine reveals no more than minimal degenerative changes in Casteel's back and neck (TR 32).  An MRI of the cervical spine obtained on Aug. 9, 2007, by Lincoln Trail Diagnostic revealed only "mild multilevel degenerative disk desiccation with no evidence of disk herniation, neural foraminal narrowing or cord flattening.  (TR 401).  The MRI report notes that Casteel's prevertebral soft tissues are within normal limits as was her spinal cord signal.  (*Id*.).  Consequently, the impression of the interpreting physician, Dr. Carter Craddock, was "negative cervical spine."  (*Id*.).

Dr. John Diebold reached the same conclusion based on an earlier radiology report obtained at Norton Hospital on Jan. 19, 2007 (TR 418-420).  A CT myelogram performed on that date revealed normal spinal cord size and shape, vertebral alignment within normal limits, intact disk heights, and prevertebral soft tissues within normal limits with no significant neural formanal narrowing or cord flattening at the C2-3, C3-4, C4-5, C5-6 or C7-T1 levels of the cervical spine.  (TR 420).  At most, the imaging revealed only a "small central disk osteophyte complex at the C6-7 with no significant neural foramenal narrowing or cord flattening."  (*Id*.).

Both of these 2007 diagnostic image studies are consistent with an earlier MRI of Casteel's cervical and lumbar spine obtained by Lincoln Trail Diagnostics in September of 2006 (TR 440).  Dr. Thomas Vaughan's impression upon review of the MRI results was an "essentially normal negative cervical spine MRI [with] minimal degenerative change with minimal-to-mild right 3-4 foramenal narrowing, otherwise [a] normal study."  (*Id*.).  Based on his own review of the diagnostic imaging, Dr. Gregory Nazar, a neurosurgeon, commented in his report of Sept. 10, 2008:

27

> On review of her cervical MRI study, [Casteel] ... has minimal
> degenerative changes but certainly not the extent that one would
> expect that would produce neck pain.  I saw no abnormalities in
> the areas of the upper spine.  There is no evidence of a Chiari
> malformation.  Her brain MRI is otherwise unremarkable with the
> exception of the low grade tumor, which, again, is doubtful to be
> related to her headaches.

(TR 486).

Repeated physical examinations of Casteel similarly failed to reveal any significant limitations or other abnormalities that would be indicative of a severe impairment of disabling degenerative disk disease.  Physical examination by Dr. Michael Sowell at University Neurologists on May 22, 2008, revealed normal muscle strength throughout the extremities, normal sensation, normal gait and station with normal symmetric reflexes in both the upper and lower extremities (TR 320).

Essentially the same normal examination results were reported based on earlier physical examinations at University Neurologists on Feb. 18, 2008 (TR 323) and on Dec. 4, 2007 (TR 326-27).  On the earlier date, Casteel exhibited a normal range of motion in her neck and spine, normal sensation and muscle strength in both upper and lower extremities, normal gait and station, and normal deep tendon reflexes throughout her extremities (TR 327).  Physical examination results from Sept. 27, 2007, likewise revealed an absence of any significant clinical abnormalities (TR 331-32).  Dr. Finizio in his later examination of Casteel on July 16, 2008, likewise observed normal 5/5 strength throughout the extremities along with intact sensation (TR 384).  These findings are similar to earlier physical examination results obtained by Dr. Finizio on Aug. 20, 2007 (TR 396-97).

The above physical examination results are identical to those obtained by

consultative examiner Jules Barefoot, M.D., who physically examined Casteel on July 29, 2008 (TR 443-44).   Dr. Barefoot's consultative examination report indicates that Casteel "had no restrictions ... in the range of motion measurements involving her spine."  (TR 444). Accordingly, ALJ Jacobs' finding no. 5 is fully supported by substantial evidence that Casteel retains the RFC to perform a limited range of sedentary work under the conditions set forth in the finding.

During the administrative hearing of April 23, 2010 (TR 41-74), ALJ Jacobs presented vocational expert William Harpool with a hypothetical question that contained the RFC limitations set forth in finding of fact no. 5 (TR 70-71).  Based on such limitations, the VE testified that given Casteel's age, education, work history and RFC, she would be able to perform alternative sedentary work in jobs such as inspector, hand packer and surveillance monitor (TR 71).

The testimony of a vocational expert may be substantial evidence to support a decision of the ALJ if that testimony is made in response to a hypothetical question that accurately portrays the mental and physical impairments of the claimant.  *Ealy*, 594 F.3d at 512-13 (citing *Varley v. Sec'y*, 820 F.2d 777, 779 (6th Cir. 1987)).  The hypothetical question to the VE is not required to include a list of the claimant's medical conditions.  *Wadd v. Comm'r*, 368 F.3d 629, 632-33 (6th Cir. 2004).  The ALJ may present a hypothetical to the VE on the basis of the ALJ's assessment of the claimant's credibility.  *Jones v. Comm'r*, 336 F.3d 469, 475-76 (6th Cir. 2003) (citing *Townsend v. Sec'y*, 762 F.2d 40, 44 (6th Cir. 1985)).  The hypothetical question need not incorporate those limitations asserted by the claimant that are properly rejected by the ALJ based upon his independent review of the record.  *Foster v. Halter*, 279 F.3d 348, 356-57

(6th Cir. 2001).

Because the hypothetical question proposed by ALJ Jacobs to VE Harpool accurately portrayed Casteel's mental and physical impairments, and because the VE identified a significant number of jobs that Casteel remains capable of performing in the regional and national economy, the Commissioner carried his burden at step 5 of the sequential evaluation process to prove that Casteel is not disabled from substantial gainful activity under the Act. Accordingly, the decision of the Commissioner should be affirmed for the reasons set forth more fully above.[10]

## RECOMMENDATION

The Magistrate Judge having made findings of fact and conclusions of law recommends that the decision of the Commissioner be **AFFIRMED** and that Casteel's complaint be dismissed with prejudice.

## NOTICE

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd.*, 474 U.S. 140 (1985). 28 U.S.C. § 636(b)(1)(c); Fed.R.Civ.P. 72(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

---

[10]  Although Casteel also challenges findings of fact 9, 10 and 11, her arguments in this regard are rendered moot by the determination that the Commissioner carried his burden at step 5 of the sequential evaluation process.

Copies to Counsel of Record